UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ETHAN ACEVEDO,

        Plaintiff,

        v.

TOMASZ ZATORA, et al.,

        Defendants.

No. 24 CV 12654

Judge Georgia N. Alexakis

MEMORANDUM OPINION AND ORDER

Defendants Tomasz Zatora, a Chicago police officer, and the City of Chicago move to dismiss plaintiff Ethan Acevedo's amended complaint. [68]. For the reasons stated below, that motion is granted in part and denied in part. The Court dismisses with prejudice Counts I and IV as to both defendants and Count III as to the City. It dismisses without prejudice Count II as to both defendants. The Court denies defendants' motion to dismiss Count III as to Zatora and to strike Acevedo's request for punitive damages.

## I. Legal Standards

Defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of Acevedo's amended complaint. *Christensen v. Cnty. of Boone, Ill.*, 483 F.3d 454, 458 (7th Cir. 2007). Dismissal is warranted only if the allegations, taken as true (as the Court does in the section that follows), do not state a plausible claim for relief. *Id.*

## II. Background

On March 30, 2024, Ethan Acevedo and six others arrived outside a Planned Parenthood in Chicago. [64] ¶¶ 20–21. Someone in Acevedo's group set up an amplifier on a public sidewalk across the street from the Planned Parenthood and began speaking into an attached microphone. *Id.* ¶ 26. In relevant part, Municipal Code of Chicago ("MCC") § 8-32-070 prohibits amplified sound on public property that is "louder than average conversational level at a distance of 100 feet or more, measured vertically or horizontally, from the source," absent a permit. *See also* [64] ¶ 53. Acevedo assessed that this group member's "amplified speech from 100 feet across [the street] was not louder than average conversational volume" and thus complied with the ordinance. *Id.* ¶ 33.

About 12 minutes after Acevedo's group began using amplified speech, Chicago Police Department ("CPD") officers arrived at the Planned Parenthood. *Id.* ¶ 27. The officers "showed no interest in the amplified speech and did not comment on the amplification or its volume." *Id.* ¶ 31. More than half an hour after the officers' arrival, Acevedo crossed the street, took over the microphone, and began speaking about "the religious, social, and political ramifications of abortion." *Id.* ¶¶ 34–35. Acevedo's volume was never louder than average conversational volume from 100 feet away. *Id.* ¶¶ 36, 47.

At some point, CPD officer Tomasz Zatora told a member of Acevedo's group that he had seen them before and understood that the group was exercising its First Amendment rights, but that "the megaphone is loud, and you guys don't have a

2

permit for this." *Id.* ¶¶ 41–42. One member of Acevedo's group disputed whether a permit was required and invited Zatora to measure the decibel level of the amplified sound. *Id.* ¶¶ 43–44. Zatora said the officers did not have a way of measuring the decibel levels. *Id.* ¶ 44. A short time later, Zatora approached Acevedo and told him to stop speaking into the microphone. *Id.* ¶ 46. Zatora indicated that the officers had received some sort of report about amplified sound, that there was "an ordinance against that," and told Acevedo: "You cannot have any amplified sound on the public way that can be heard from a hundred feet." *Id.* ¶¶ 48, 50. After Acevedo asked to see the ordinance, Zatora offered to print Acevedo a copy. *Id.* ¶¶ 56–58.

Zatora departed and, after returning, handed Acevedo a printed copy of the ordinance. *Id.* ¶ 59. Acevedo began reading the ordinance aloud into his microphone. *Id.* After Acevedo finished reading the ordinance's relevant subsection and began reading the next subsection, Zatora attempted to retrieve the ordinance. *Id.* ¶ 60. Acevedo "indicated he was not finished reading the ordinance," and Zatora again told Acevedo to stop using the microphone. *Id.* ¶ 61. At this point, Acevedo either "sought clarification" or "attempted to continue speaking and asserting his right to speak." *Id.* ¶¶ 62, 175. Zatora then arrested him. *Id.* ¶ 62.

Acevedo was cited for violating MCC § 8-32-070, the noise ordinance, and MCC § 8-4-010(e), which makes it unlawful to fail "to obey an order by a peace officer … under circumstances where it is reasonable to believe that the order is necessary to allow public safety officials to address a situation that threatens the public health, safety, or welfare." *See also* [64] ¶ 72. Following a bench trial, a state court judge

3

found Acevedo not guilty of violating the noise ordinance and dismissed the disorderly conduct charge for want of prosecution. *Id.* ¶ 76.

After filing his initial complaint against defendants, [1], Acevedo moved for a preliminary injunction, [4]. The Court denied that motion and granted defendants' motion to dismiss the original version of Acevedo's complaint. [60], [61]. Acevedo then filed an amended complaint [64], which defendants again move to dismiss. [68].

### III. Analysis

#### A. Body-Worn Camera Footage

Defendants ask the Court to consider body-worn camera footage when resolving their motion. Acevedo submitted this footage with his first complaint, *see* [1] ¶ 24, but he did not produce it with or reference it in the amended complaint, [69-1] at 7–8.

Generally, the Court cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment. *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018). Under the incorporation-by-reference doctrine, however, the Court may consider exhibits that "are central to the complaint and are referred to in it." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Passing references to video footage does not make the footage "central" to the complaint. *Brown v. City of Chicago,* 594 F. Supp. 3d 1021, 1030 (N.D. Ill. 2022). The doctrine is therefore inapplicable to the amended complaint, which does not rely upon, and at best only makes passing reference to, video footage.

4

Separately, the Court may take judicial notice of facts in the public record that are "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). That said, the Court may rely on body-worn camera footage only when it "utterly discredits" the plaintiff's version of facts, "such that there could be no reasonable disagreement about what the video depicts." *Esco v. City of Chicago*, 107 F.4th 673, 679 (7th Cir. 2024).

Defendants ask the Court to consider the footage which, in their view, discredits Acevedo's allegation that his amplification remained within the noise ordinance's volume limits. *See, e.g.,* [69-1] at 9; [83] at 1–2. Although the videos contain audio, the Court cannot discern the volume of Acevedo's amplification from the footage. That determination is a factual one, inappropriate for resolution at this early stage in the proceedings. Because the Court cannot "clearly and definitively" say that the video discredits Acevedo's assertions that his volume remained below the noise ordinance's bounds, the Court does not consider the footage for that purpose. *Esco,* 107 F.4th at 679.

### B. First Amendment's Freedom of Speech Clause (Count I)

In Count I of his first amended complaint, Acevedo alleges that defendants violated his First Amendment rights under that constitutional provision's Freedom of Speech Clause by arresting him for using voice amplification to express political and religious views related to abortion. *E.g.,* [64] ¶ 120–21, 134. The Court previously invited Acevedo to clarify the nature of his First Amendment claim. [61] at 15 ("It is

not clear to me what First Amendment theory Mr. Acevedo is pursuing under Count 1. He does not allege that the ordinance itself is unconstitutional, either facially or as applied to him. Indeed, as I just discussed with respect to the preliminary injunction motion, he asks me to enforce the ordinance there."). Now, in his amended complaint, Acevedo alleges that "[a]s applied to [his] speech, the City's and Sgt. Zatora's enforcement of the ordinance violated the First Amendment." [64] ¶ 130. And in his opposition brief, Acevedo writes that he "is bringing an as-applied First Amendment challenge against Defendants' suppression of amplified religious speech through systematic misapplication of the Ordinance." [77] at 5. Armed with this understanding of Acevedo's First Amendment claim, the Court finds it lacks merit as an as-applied challenge to the municipal noise ordinance.

By way of background, there are two types of First Amendment challenges: "facial" challenges, where the plaintiff alleges that the law is unconstitutional in all its applications, or "as-applied" challenges, where the plaintiff alleges that the law may be validly applied to others, but is unconstitutional as applied to the particular facts of his case. Marc E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement*, 48 AM. U. L. REV. 359, 360 (1998). The difference between the two types of challenges can be murky and is generally unimportant at the pleading stage but becomes more crucial at the remedy stage: While facial challenges tend to invite prospective relief, such as injunctions, as-applied challenges invite narrower, retrospective relief, like damages. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010).

To mount a successful as-applied challenge, a plaintiff must allege that a law, when applied to *his* circumstances, violates *his* First Amendment rights. *See HH-Indianapolis, LLC v. Consol. City of Indianapolis & Cnty. of Marion*, 889 F.3d 432, 439 (7th Cir. 2018) ("[t]he critical inquiry" in the plaintiff's as-applied challenge is whether the ordinance abridges the plaintiff's First Amendment rights). For example, in *National Institute of Family & Life Advocates v. Schneider*, a group of crisis pregnancy centers and their personnel alleged that amendments to Illinois' Healthcare Right of Conscience Act required them to discuss the benefits of abortion, contraception, and sterilization with clients, despite their "conscience objections" to those treatments. 484 F. Supp. 3d 596, 621 (N.D. Ill. 2020). These statutory amendments, the plaintiffs argued, violated their First Amendment free speech and exercise rights. *Id.* Their arguments only concerned the law's application to crisis pregnancy centers and their personnel and did not identify any other context in which the law's enforcement would be unconstitutional. *Id.* The district court noted that, requested relief aside, this type of challenge sounded "more like an as-applied than a facial challenge." *Id.*

Nowhere does Acevedo allege that he is mounting a facial challenge to the municipal noise ordinance. And although he describes his challenge as an as-applied one, [77] at 5, unlike the plaintiffs in *Schneider*, Acevedo never alleges that the noise ordinance, when properly applied, unconstitutionally restricts his speech. In fact, he alleges that his speech was "plainly legal" under the ordinance. [64] ¶ 2. Acevedo's First Amendment claim is really that defendants *mis*applied the ordinance to his

7

ordinance-compliant speech and conduct and, by misapplying it, violated his constitutional rights. [77] at 5; [64] ¶ 77 (alleging the "misapplication" of Chicago's noise ordinance to Christian street preachers); *id.* ¶ 78 (alleging police enforcement of the noise ordinance "regardless of actual volume levels or what the ordinance actually requires"); *id.* ¶ 80 (alleging wrongful arrests and prosecutions under the ordinance); *id.* ¶ 118 (alleging that Chicago "silenc[es] speech through misapplication of the ordinance"); *id.* ¶ 142 (alleging "misapplication of the noise ordinance"); *see also id.* ¶¶ 130, 137, 161, 173 (alleging that defendants silenced Acevedo's "ordinance-compliant" speech).

Acevedo's First Amendment grievance, then, is not with the noise ordinance's constitutionality, either facially or as applied to his circumstances. He instead challenges defendants' decision to arrest him for violating the noise ordinance despite his compliance with it and purportedly owing to his protected speech. This claim is indistinguishable from Acevedo's First Amendment retaliation claim (Count IV of his amended complaint), where he alleges that he was unjustly arrested in retaliation for his protected speech, despite his compliance with the noise ordinance. [64] ¶¶ 171–77. Acevedo's First Amendment claim in Count I is therefore duplicative of his First Amendment claim in Count IV, so the Court dismisses Count I for the same reasons it sets forth later in this opinion when discussing Count IV. *See infra* at 18–23.

## C. The City's Liability Under § 1983

Defendants contend that the complaint does not plead a plausible municipal liability claim under *Monell v. Department of Social Services of New York*, 436 U.S.

658 (1978), so Acevedo's 42 U.S.C. § 1983 claims against the City of Chicago must fail. To establish the City's liability under *Monell*, Acevedo must show that (1) he suffered a deprivation of a federal right, (2) as a result of an express municipal policy, widespread custom, or deliberate act of a decisionmaker with final policymaking authority for the City, which (3) proximately caused his injury. *Ovadal v. City of Madison, Wisc.*, 416 F.3d 531, 535 (7th Cir. 2005).

With respect to municipal action, Acevedo does not point to an express policy or a decision by a person with final policymaking authority. Instead, Acevedo alleges that a widespread custom led to the deprivation of his First and Fourth Amendment rights. [64] ¶¶ 77–118, 131. But he offers varying, and somewhat inconsistent, definitions of this custom or practice. In one instance, he refers to the problematic municipal "pattern and practice" quite generally: as the City's "pattern and practice of harassing, arresting, and prosecuting Christian street evangelists." [64] at 11. In the text that immediately follows this formulation, Acevedo drops the references to harassment, arrests, or prosecutions and focuses exclusively on the "systematic misapplication of [the City's] noise ordinance to silence a number of Christian street preachers who use voice amplification." *Id.* ¶ 77. Later in the complaint, Acevedo alleges that the City's alleged misapplication of the noise ordinance is not limited to street preachers, Christian or otherwise. He contends that the City:

> has a policy, custom, or practice carried out through its police department of preventing Christian street preachers (*and presumably others*) from using voice amplification on the public way by misapplying the noise ordinance to prohibit *all amplified religious speech* (*and possibly other speech*) regardless of volume or compliance with the ordinance's actual requirements.

9

*Id.* ¶ 131 (emphases added).

These shifting theories of *Monell* liability do not give the City fair notice of the municipal action at issue. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). The City, like the Court, is left to cobble together Acevedo's various allegations to try to understand the nature of his accusation. For example: Do officers involved in the allegedly problematic practice exclusively target Christian street preachers engaged in religious speech, or do the officers also target street preachers of "all" faiths and other individuals not engaged in religious speech at all? Do officers consistently invoke the noise ordinance when they encounter Christian street preachers, or do they arrest Christian street preachers for other alleged infractions and without invoking the noise ordinance at all? This pleading deficiency provides sufficient grounds to dismiss Acevedo's *Monell* claim. *See Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 609, 622 (7th Cir. 2012) ("To satisfy the notice-pleading standard of Rule 8 of the Federal Rules of Civil Procedure, a complaint must provide a 'short and plain statement of the claim showing that the pleader is entitled to relief,' which is sufficient to provide the defendant with 'fair notice' of the claim and its basis.").

The Court nonetheless continue its analysis of the *Monell* claim, adopting the following formulation of Acevedo's theory of liability: the City's alleged practice "of preventing Christian street preachers … from using voice amplification on the public way by misapplying the noise ordinance to prohibit … amplified religious speech …

10

regardless of volume or compliance with the ordinance's actual requirements." *See* [64] ¶ 131.[1]

To determine whether Acevedo has sufficiently pleaded a widespread custom theory of *Monell* liability using the above formulation, the Court looks to "the instances of misconduct alleged, the circumstances surrounding the alleged constitutional injury, and additional facts probative of a widespread practice or custom." *Williams v. City of Chicago*, 315 F. Supp. 3d 1060, 1079 (N.D. Ill. 2018). Generally speaking, a plaintiff must plead more than a single incident of wrongdoing to allege *Monell* liability; the widespread custom alleged must "permeate[ ] a critical mass of [the] institutional body." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005); *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015). This requirement aims to ensure that the plaintiff has identified a true citywide custom, rather than just one isolated event. *Walker v. City of Chicago*, 596 F. Supp. 3d 1064, 1074 (N.D. Ill. 2022).

In addition, Acevedo must allege a pattern of constitutional violations similar to those he suffered. The comparators need not be perfect but must be similar enough to show a widespread practice. *See Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 657 (7th Cir. 2021); *Hamilton v. Oswego Cmty. Unit Sch. Dist.* 308, 20 C 0292,

---

[1] In opposing defendants' motion, Acevedo again articulates his theory of *Monell* liability differently, describing it as a municipal practice of "regularly us[ing] threats of arrest or actual arrest to silence evangelists' speech after they insisted on their legal rights" to engage in "amplified religious speech." [77] at 16. Because Acevedo cannot amend his complaint through his brief, the Court focuses on the allegations in the amended complaint. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011)).

2021 WL 767619 at *10 (N.D. Ill. Feb. 26, 2021) (the incidents do not need to be identical but must be "sufficiently similar to support an inference of a broader pattern"). For example, the plaintiff in *Arquero v. Dart* alleged that he knew of "at least seven individuals" who, like him, were detained without cause because of defendants' practice of knowingly using faulty electronic monitoring equipment. 587 F. Supp. 3d 721, 729 (N.D. Ill. 2022). And in *Cosby v. Rodriguez*, the plaintiff, a protestor who alleged CPD officers used excessive force against him in violation of the Fourth Amendment, sufficiently alleged a widespread pattern of similar constitutional violations by detailing CPD's history of employing excessive and retaliatory force against other protestors, including by pointing to specific media reports and reports from the United States Department of Justice and the City's Office of Inspector General. 711 F. Supp. 3d 983, 1010–11 (N.D. Ill. 2024).

To support his allegation that the City engages in the practice of "preventing Christian street preachers … from using voice amplification on the public way by misapplying the noise ordinance to prohibit … amplified religious speech … regardless of volume or compliance with the ordinance's actual requirements," Acevedo references the following incidents:

- An incident, alleged in *Raio v. City of Chicago,* No. 25 C 2709, 2026 WL 515703 (N.D. Ill. Feb. 24, 2026), where the three plaintiffs used amplification to preach on a Chicago street corner, and CPD officers demanded they produce a permit for amplification. [64] ¶ 87 (referencing "another currently pending case"; *id.* ¶¶ 88–97 (describing the allegations in *Raio*). When the three plaintiffs failed to produce a permit for amplification, the officers handcuffed one plaintiff and charged him with violating a municipal noise ordinance regarding the use of amplification on public transportation, along with a municipal ordinance forbidding

resisting a police officer or aiding escape. *Id.* ¶¶ 91, 94; *Raio,* No. 25 C 2709, 2026 WL 515703 at *2. Those charges were later dismissed. [64] ¶ 97.

- A second incident alleged in *Raio* where two of the plaintiffs used amplification to preach on a Chicago street corner and were instructed by CPD officers to turn down their volume. *Id.* ¶¶ 98–99. The officers arrested and charged the two plaintiffs with violating MCC § 8-32-070, the same noise ordinance at issue here. *Id.* ¶¶ 100–01; *Raio,* No. 25 C 2709, 2026 WL 515703 at *3. Their case was later dismissed after the officers failed to appear in court. [64] ¶ 102.

- Acevedo's own experience in October 2024, where he preached with amplification on a street corner. *Id.* ¶ 106. CPD officers told him he was violating the noise ordinance, but refused to explain how, and instead ordered that the amplification be turned off altogether or Acevedo "would face repercussions." *Id.* ¶¶ 107–08. Acevedo does not allege whether he turned off his amplifier following this conversation.

- Another of Acevedo's own experiences—this time in May 2025—when Acevedo "was assaulted by a passerby while preaching with amplification." *Id.* ¶ 111. Nearby CPD officers took no action other than to tell Acevedo that the assault was his fault for using amplification. *Id.* Acevedo does not allege that the officers invoked the noise ordinance or that he turned off his amplifier following this interaction.

- The experience of another individual (Loukas Papaionannou), in May 2025, where officers ordered him to shut off his speaker and "refus[ed] his offer to lower the volume." *Id.* ¶ 109. Acevedo does not expressly allege that Papaionannou was engaged in street preaching on that occasion, although the Court draws that reasonable inference based on other facts in the complaint. But Acevedo does not allege that the officers invoked the noise ordinance or that the individual turned off his amplifier following this interaction.[2]

_____

[2] For purposes of determining the sufficiency of Acevedo's *Monell* claim, the Court sets aside a handful of other allegations that purport to bear on it: that Acevedo has "repeatedly experienced" Chicago police "yell[ing]" at him and "express[ing] vehement dislike of his viewpoint," and another individual's estimation that "Chicago police interfere with evangelists in a third of the ministry activities on Chicago sidewalks" in which that individual has participated. [64] ¶¶ 103, 104, 110. These allegations do not bear on the misapplication of a municipal noise ordinance; they do not involve volume-related complaints whatsoever. Nor do they involve allegations of First Amendment deprivations or false arrests under the Fourth Amendment, so they do not move Acevedo any closer to alleging a pattern of similar constitutional injuries to those he suffered, for the same reasons explained *infra* at 15–17.

13

For the reasons that follow, these incidents do not support an inference of a broader pattern of CPD officers "preventing Christian street preachers … from using voice amplification on the public way by misapplying the noise ordinance to prohibit … amplified religious speech … regardless of volume or compliance with the ordinance's actual requirements." [64] ¶ 131.

As the Court previously explained, *see* [61] at 12–13, the references to *Raio* do not help Acevedo's *Monell* claim. "[T]he existence of other lawsuits, without more, does not shed much light on the underlying facts. A lawsuit is an allegation. So pointing to other lawsuits simply establishes that other people have made accusations against [the defendant]." *Arquero,* 587 F. Supp. 3d at 730 (citations omitted). Acevedo does not respond to this argument in his opposition brief other than to point out that his *Monell* claim "does not rely merely on the existence of other lawsuits." [77] at 8, 16. It is unclear what Acevedo means by this statement. Did he get the facts that make up his *Raio*-related allegations from a source other than the "declarations in another currently pending case"? [64] ¶ 87. If so, he does not identify any such source, so the Court can only reasonably infer that Acevedo has relied on accusations in a pending lawsuit to support that portion of his complaint. As another possibility, Acevedo may mean that, *Raio* aside, the other incidents he and the other individual personally experienced, by themselves, sufficiently support his *Monell* claim. If that's the case, the Court disagrees.

Acevedo attempts to allege two constitutional violations: false arrest in violation of the Fourth Amendment and First Amendment retaliation. So, the

14

question is whether, through the three incidents that he and the other individual experienced in October 2024 and May 2025, Acevedo has adequately alleged a pattern of First and Fourth amendment violations "sufficiently similar" to those he suffered. *Hamilton*, 20 C 0292, 2021 WL 767619 at *10.

To have suffered First Amendment retaliation, an individual must have (1) engaged in activity protected by the First Amendment; (2) suffered a deprivation that would likely deter First Amendment activity in the future; where (3) the First Amendment activity was at least a motivating factor in the officers' decision to take the retaliatory action. *Whitfield v. Spiller,* 76 F.4th 698, 707–08 (7th Cir. 2023). A "deprivation" is conduct that "would likely deter a person of ordinary firmness from continuing to engage in protected activity." *FKFJ, Inc. v. Vill. of Worth,* 11 F.4th 574, 585 (7th Cir. 2021) (quotations omitted).

In neither of Acevedo's other alleged experiences does he contend that he suffered a "deprivation" at the hands of the officers. *Id.* In Acevedo's May 2025 experience, a third party—not an officer—assaulted Acevedo. [64] ¶ 111. In Acevedo's October 2024 experience, the officers only told Acevedo that he would "face repercussions" if he continued to use amplification. *Id.* ¶ 107. And in the third experience, involving Papaionannou, Acevedo similarly never alleges that Papaionannou suffered any kind of "deprivation." *Id.* ¶ 109. In none of the three incidents does Acevedo allege that the officers' behavior deterred him or Papaionannou from continuing to use amplification or engage in protected speech— either during those particular instances or on subsequent occasions. Rather, Acevedo

15

alleges that he "tri[es] to stand against illegal enforcement" and, based on other facts alleged in his complaint, appears undeterred by these incidents. *Id.* ¶ 118; *see also id.* ¶¶ 15–16, 39 (alleging that since the March 2024 incident at the center of this complaint, Acevedo has graduated from Moody Bible Institute, has "gone into full time ministry," "has regularly engaged in evangelistic outreach," and "has extensive experience using amplification for street preaching"). Likewise, Papaionannou reports that he experiences CPD interference in "a third of the ministry activities on Chicago sidewalks that [he] has participated in," indicating that he remains similarly undaunted by police intrusion. *Id.* ¶ 110. In putting forward these three incidents, Acevedo has failed to allege a pattern of First Amendment retaliation, similar to his own injury, that resulted in a "deprivation" that "would likely deter a person of ordinary firmness from continuing to engage in protected activity." *FKFJ,* 11 F.4th at 585. And while Acevedo adds that because "evangelists in Chicago reasonably expect to be confronted by CPD officers whenever they use amplification," some "self-censor or cease their activities to avoid arrest," [64] ¶ 118, this allegation lacks factual support (e.g., the identification of a self-censoring evangelist). The Court therefore cannot credit this allegation when evaluating the motion to dismiss. *See Iqbal*, 556 U.S. at 678 (plaintiff must allege sufficient "factual content to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

Nor in any of the three specified incidents does Acevedo allege that he or Papaionannou were arrested without probable cause in violation of the Fourth

Amendment, as required to state a claim for false arrest. *Id.* ¶¶ 107, 109, 111; *see also Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016).

Because Acevedo fails to allege a pattern of First or Fourth Amendment violations similar to his own, he has again failed to allege a widespread practice under *Monell*. "[A] plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015). Acevedo already has been given this opportunity. The dismissal of his § 1983 claims against the City is now with prejudice. *Accord Harris v. City of Chicago,* No. 24 CV 3215, 2025 WL 2044020, at *10 (N.D. Ill. July 21, 2025) (dismissing *Monell* claim with prejudice where plaintiff already had an opportunity to amend); *Common v. City of Chicago*, No. 21 C 5198, 2022 WL 3594636, at *4 (N.D. Ill. Aug. 23, 2022) (same).

### D. Illinois Religious Freedom Restoration Act (Count II)

Acevedo claims defendants violated the Illinois Religious Freedom Restoration Act ("IRFRA"). Pursuant to the IRFRA:

> [The] [g]overnment may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest.

775 ILCS 35/15. The "hallmark of a substantial burden on one's free exercise of religion is the presentation of a coercive choice of either abandoning one's free exercise of religious convictions or complying with the government regulation."

17

*Baumgartner v. City of Chicago,* 759 F. Supp. 3d 868, 879–80 (N.D. Ill. 2024) (quoting *Diggs v. Snyder*, 333 Ill. App. 3d 189, 195 (2002)).

But Acevedo has not alleged that he faced a "coercive choice" between abandoning his religious convictions or complying with a City regulation. Rather, Acevedo alleges that he *did* comply with the City's ordinance while exercising his religious convictions. *See, e.g.* [64] ¶ 161. And as already explained, he has not sufficiently alleged that the City engages in a widespread practice of "preventing Christian street preachers … from using voice amplification on the public way by misapplying the noise ordinance to prohibit … amplified religious speech … regardless of volume or compliance with the ordinance's actual requirements." *Id.* ¶ 131; *see supra* at 8–17. Because Acevedo has not identified a government regulation that substantially burdened the exercise of his religion, his IRFRA claim fails. Because the Court had not previously addressed deficiencies with this claim, *see* [61] at 20, Count II is dismissed without prejudice, and Acevedo has leave to re-plead Count II. *See Runnion,* 786 F.3d at 519.

### E. First Amendment Retaliation (Count IV)

In Count IV, Acevedo alleges that Zatora arrested him in retaliation for his protected speech. Again, to state a First Amendment retaliation claim, Acevedo must allege that (1) he engaged in activity protected by the First Amendment, (2) he suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity motivated Zatora's decision to take the

18

retaliatory action. *145 Fisk, LLC v. Nicklas*, 986 F.3d 759, 766 (7th Cir. 2021); *see also Whitfield,* 76 F.4th at 707–08.

Acevedo alleges that he engaged in activity protected by the First Amendment: his political and religious speech "about Christian views on a political issue, to wit, abortion," [64] ¶¶ 120–21. Acevedo's complaint repeatedly describes the activity pertinent to his First Amendment retaliation claim as the *content* of his speech, not the manner in which he was communicating it. *See id.* ¶ 120; *see also id.* ¶ 173 (alleging that Acevedo was arrested in retaliation for being "lawfully engaged in religious and political speech"); *id.* at ¶ 176 (alleging that "Zatora's arrest of [Acevedo] was motivated, at least in part, by [Acevedo's] exercise of his constitutional right to speak on matters of religion and politics."). The Court analyzes the remainder of his First Amendment retaliation claim with that understanding.[3]

Acevedo also alleges that he suffered a deprivation: his arrest. *Id.* ¶ 62.

Acevedo falters, however, on the final prong: He has not sufficiently alleged that his First Amendment activity motivated Zatora's decision to arrest him. To prevail on a retaliation claim, "[i]t is not enough to show that [Zatora] acted with a retaliatory motive and that [Acevedo] was injured—the motive must *cause* the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against [Acevedo] would not have been taken absent the retaliatory motive." *Nieves v.*

---

[3] The Court's understanding is also informed by Acevedo's articulation of his *Monell* claim. Acevedo alleged that police targeted him and Papaioannou because they "dislike[d] his viewpoint" and because "the Evangelists' religious convictions were the content of [Acevedo's] speech." *See id.* ¶ 104; *see also id.* ¶¶ 109–10 (alleging that, according to Papaionannou, CPD officers interfere with evangelical speech and "ministry activities," regardless of amplification).

19

*Bartlett*, 587 U.S. 391, 398–99 (2019). Even after drawing all reasonable inferences in Acevedo's favor, his own account does not demonstrate that Zatora would not have arrested Acevedo had Acevedo not been exercising "his constitutional right to speak on matters of religion and politics." [64] ¶ 176.

After Zatora arrived outside the Planned Parenthood, he mentioned to another member of Acevedo's group that he had seen the group before, acknowledged the group's exercise of their First Amendment rights, and expressed that "the only problem" with the demonstration was not the content of their speech, but the volume of the "megaphone." *Id.* ¶ 42. Zatora then approached Acevedo, asked him to stop using the microphone, and told Acevedo that he was there to "resolve the problem" of "amplified sound." *Id.* ¶¶ 46, 48. Zatora next printed Acevedo a copy of the noise ordinance, waited as Acevedo read the relevant portion of the ordinance using the microphone, "attempted"—apparently unsuccessfully—"to retrieve the paper" from Acevedo, and again instructed Acevedo to stop using the microphone. *Id.* ¶¶ 59–61, 175. Despite Zatora's instructions, Acevedo continued to do so. *Id.* ¶¶ 62, 175. Only then did Zatora arrest Acevedo. *Id.* ¶ 62. After Acevedo's arrest, an officer told Acevedo's wife that he was arrested because "he continued using amplification after being advised he could not do so without a permit." *Id.* ¶ 66.

From these facts, the Court can reasonably infer only that Zatora's arrest of Acevedo was driven by Acevedo's continued use of the microphone despite Zatora's repeated instructions to desist. Nowhere in the narrative is there any factual support for the conclusion that "Zatora's arrest of [Acevedo] was motivated, at least in part,

by [Acevedo's] exercise of his constitutional right to speak on matters of religion and politics." *Id.* ¶ 176. Acevedo does not allege, for example, that Zatora hassled his fellow group members who were engaged in political and religious speech. Rather, Acevedo alleges that the "[p]olice showed no interest" in his fellow "Evangelists" as they, like him, engaged in "amplified speech … not louder than average conversational volume." *Id.* ¶¶ 21, 31, 33. Nor does Acevedo allege that Zatora's arrest interrupted him mid-thought, as he was engaging in political or religious speech, or that Zatora made any comments concerning the content of his speech before or after arresting him. And though Zatora had apparently seen the group before—routinely enough to notice that the assembly "usually doesn't last longer than an hour"— Acevedo does not allege that Zatora had previously interfered with the group. [64] ¶ 42. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 965–66 (7th Cir. 2012) (indicia of retaliatory motive may include direct evidence of that motive, or allegations of "suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other [people] in the protected group").

Acevedo argues that his amended complaint sufficiently puts forth a retaliatory motive because it alleges that Acevedo "was arrested immediately after asserting his legal rights" and because "an officer told [Acevedo] he 'needed to be made an example of' and 'needed to be taught to obey police authority.'" [77] at 17; [64] ¶¶ 70–71. But in between expressing his religious and political views on abortion and being arrested, Acevedo failed to obey Zatora's instructions to discontinue using a microphone while reading aloud the City's noise ordinance. This sequence of events

21

reflects that Acevedo was arrested because of his disobedience—not because of his protected speech. The other officer's post-arrest comments—which focus on the need to "obey police authority"—only reinforce that conclusion. *See Mitchell v. Kirchmeier*, 28 F.4th 888, 896–97 (8th Cir. 2022) (retaliatory motive "conceivable" but not "plausible" where officers shot a protestor with bean bags shortly after he uttered words of protest, but the protestor had also ignored a countdown warning, refused to comply with orders to disperse, and no other allegations hinted at any retaliatory motive).

To be sure, in his amended complaint, Acevedo squarely asserts otherwise: "Zatora's arrest of Plaintiff was motivated, at least in part, by Plaintiff's exercise of his constitutional right to speak on matters of religion and politics." [64] ¶ 176. But courts cannot credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *See Iqbal*, 556 U.S. at 678. Instead, a plaintiff must allege sufficient "factual content to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. See also Twombly*, 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do."). Here, there is no factual content to support Acevedo's theory of First Amendment retaliation.

By comparison, a prison inmate successfully alleged First Amendment retaliation when he explained that he engaged in protected activity by submitting a grievance; that he suffered a deprivation when he was transferred to a worse prison; and that the defendants showed retaliatory motive, first, by sending an internal

22

affairs investigator to intimidate the inmate into dropping the grievance by threatening him with a transfer and, second, when a different internal affairs investigator told the inmate that it was "too late" to withdraw his grievances in the hopes of avoiding the transfer. *See Gomez v. Randle,* 680 F.3d 859, 862, 866–67 (7th Cir. 2012). Based on these allegations, *Gomez* found that the inmate had "properly asserted a claim for retaliation" and that "[n]o other explanation for Gomez's transfer is available at this early stage in the proceedings." *Id.* at 866–67. In *Santos v. Curran*, No. 17 C 2761, 2018 WL 888758 (N.D. Ill. Feb. 14, 2018), the factual content of the complaint also made plausible plaintiff's claim of retaliation. There, the plaintiff alleged that he was held at the Lake County Jail for eleven days without defendants taking any action on an immigration detainer that had been lodged against him; "that they only did so after learning [the plaintiff] filed a habeas petition"; and that an immigration officer commented that despite plaintiff's lawsuit, "they got him anyway." *Id.* at \*6 (internal quotation marks omitted). Put another way: the underlying narratives in *Gomez* and *Santos* more than plausibly supported claim of retaliation for protected activity. In contrast, Acevedo's narrative plausibly supports a claim only that he was arrested following unprotected disobedience.

Because Acevedo has failed to allege that his First Amendment activity was a motivating factor behind Zatora's decision to arrest him, and because Acevedo has now had two opportunities to state a First Amendment retaliation claim, Count IV is dismissed with prejudice.

23

### F. False Arrest (Count III)

To state a claim of false arrest, Acevedo must allege that there was no probable cause for his arrest. *Neita*, 830 F.3d at 497. An officer has probable cause to arrest if, at the time of the arrest, the facts and circumstances within his knowledge were "sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.*

Zatora's culpability for false arrest depends on whether he had probable cause to arrest Acevedo for *any* crime. *Holmes v. Vill. of Hoffman Est.*, 511 F.3d 673, 682 (7th Cir. 2007) ("[P]robable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause."). Acevedo was arrested not only for violating the noise ordinance, but for disorderly conduct under MCC § 8-4-010(e). [64] ¶ 72.

Defendants argue that Zatora had probable cause to arrest Acevedo for disorderly conduct and an Illinois criminal statute. [69-1] at 16. Acevedo does not respond to these points. As defendants point out, the Court could hold, based on this failure, that Acevedo forfeited any argument that Zatora did not have probable cause to arrest him for disorderly conduct. *Boogaard v. Nat'l Hockey League*, 891 F.3d 289, 295 (7th Cir. 2018) ("[A] district court may hold a claim forfeited if a plaintiff fails to respond to the substance of the defendant's motion to dismiss.").

24

Yet the Court declines to do so. Defendants' own argument is anemic. The disorderly conduct ordinance prohibits the failure "to obey an order by a peace officer … under circumstances where it is *reasonable to believe that the order is necessary to allow public safety officials to address a situation that threatens the public health, safety, or welfare.*" MCC § 8-4-010(e) (emphasis added). Beyond referencing Acevedo's volume as perceived from the body-worn camera footage, defendants do not explain why Zatora would have had probable cause to believe that Acevedo failed to obey an order "necessary … to address a situation that threatens the public health, safety, or welfare." *Id.* Nor do they explain how the Illinois disorderly conduct statute, 720 ILCS 5/26-1(a)(1), would apply to Acevedo's conduct. [69-1] at 16 n.6. The Court declines to dismiss Acevedo's false arrest claim based on this underdeveloped argument.

Nor can the Court say, at this early stage, that Zatora is entitled to qualified immunity. "Qualified immunity is a defense protecting government officials from both liability and suit … To receive qualified immunity, officials must show either that they did not violate a constitutional right or that the right was not clearly established at the time of the alleged violation." *Roldan v. Stroud*, 52 F.4th 335, 338 (7th Cir. 2022). Qualified immunity protects officers who reasonably but mistakenly believe that probable cause exists (or, in other words, officers who have "arguable probable cause"). *Abbott v. Sangamon Cnty., Ill.,* 705 F.3d 706, 715 (7th Cir. 2013). An officer who has arguable probable cause to make an arrest does not violate a clearly established right. *Id.*

25

Defendants argue that Zatora did not violate a clearly established right, and is therefore entitled to qualified immunity, because he had at least arguable probable cause to believe that Acevedo violated both the disorderly conduct and noise ordinances. [69-1] at 18. Defendants base these now-familiar arguments on Acevedo's refusal to follow Zatora's instructions and the volume of Acevedo's amplification. *Id*. For the same reasons the Court already has explained, the Court cannot conclude from the amended complaint or the body-worn camera footage that Zatora had arguable probable cause to believe that Acevedo violated the disorderly conduct or noise ordinances. These fact-intensive inquiries that are inappropriate for resolution on the pleadings and will benefit from factual development. *Beathard v. Lyons,* 129 F.4th 1027, 1033–34 (7th Cir. 2025). The Court therefore declines to hold at this early stage that Zatora is entitled to qualified immunity. Acevedo's Fourth Amendment claim against Zatora may proceed.

## IV. Motion to Strike Punitive Damages

Defendants move to strike Acevedo's claim for punitive damages. [69-1] at 21. Again, Acevedo does not respond to this argument. But again, because defendants' motion is undeveloped and premature on this point, the Court declines to find Acevedo's claim forfeited.

Pursuant to Federal Rule of Civil Procedure 12(f), the Court "may strike from a pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Defendants do not contend, nor does it appear to the Court at this early stage, that Acevedo's request for punitive damages is redundant,

immaterial, impertinent, or scandalous, such that striking the claim would be warranted. Whether punitive damages are appropriate is a question for another day. The Court therefore denies this aspect of defendants' motion without prejudice.

## V. Conclusion

For the reasons stated above, the Court grants in part and denies in part defendants' motion to dismiss the first amended complaint. [68]. The Court dismisses with prejudice Counts I and IV as to both defendants and Count III as to the City. It dismisses without prejudice Count II as to both defendants. The Court denies the motion to dismiss Count III as to Zatora and denies the motion to strike Acevedo's request for punitive damages.

Acevedo may file a second amended complaint only as to Count II by May 26, 2026. If he declines to file a second amended complaint, the dismissal of Count II will automatically convert to one with prejudice. The Court sets a status hearing to discuss next steps in this case on June 2, 2026, at 9:30 a.m. By May 29, 2026, the parties should jointly submit a report proposing a discovery plan and discussing the possibility of settlement.

ENTER:

_____
Georgia N. Alexakis
United States District Judge

Date: May 11, 2026

27